IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STACY AMOROSO**<br>7208 Riverview Avenue<br>Bristol, PA 19007<br><br>*Plaintiff,*<br><br>vs.<br><br>**ALDIE COUNSELING CENTER, INC.**<br>228 N. Main Street<br>Doylestown, PA 18901<br><br>*Defendant.* | NO. _____<br><br>CIVIL ACTION<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, by and through undersigned counsel, hereby files the Complaint against Defendant.

### INTRODUCTION

1. Plaintiff initiates this action to seek redress against Defendant for unlawful violations of applicable federal and state law.

### PARTIES

2. Plaintiff, Stacy Amoroso ("Plaintiff") is an adult individual currently residing at the above captioned address.

3. Defendant, Aldie Counseling Center, Inc. is believed to be a corporation that exists pursuant to the laws of the Commonwealth of Pennsylvania as a non-profit organization with a principal place of business at the above-captioned address.

4. At all times relevant hereto, Defendant acted by and through its agents, servants, and employees, each of whom, at all times relevant, acted within the scope of her or her job duties.

5. Defendant is an "employer" within the meaning of the ADA because it is engaged in an industry affecting interstate commerce and because they maintained or maintains fifteen ("15") or more employees for each working day in each of twenty ("20") or more weeks in the current or preceding calendar year.

6. Defendant is an "employer" within the meaning of the Title VII because it is engaged in an industry affecting interstate commerce and because they maintained or maintains fifteen ("15") or more employees for each working day in each of twenty ("20") or more weeks in the current or preceding calendar year.

7. Defendant is also an "employer" under the Pennsylvania Human Relations Act because it maintains four ("4") or more employees.

## JURISDICTION and VENUE

8. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

9. The Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the Supreme Court of the United States in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

10. The United States District Court for the Eastern District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and

1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

11. The Court may also maintain supplemental jurisdiction over state law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction in that they form part of the same case or controversy.

12. Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendant is located in and conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district (Plaintiff was employed in the Eastern District of Pennsylvania at the time of the illegal actions set forth herein)

## PROCEDURAL and ADMINISTRATIVE REMEDIES

13. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

14. Plaintiff has satisfied the procedural and administrative requirements for proceeding with a discrimination action.

15. Plaintiff cross-filed a timely written charge of discrimination with the Philadelphia office of the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission alleging discrimination and retaliation on or about February 22, 2019 (No. 530-2019-02532).

16. The instant action is timely because it is initiated at least ninety ("90") days after the receipt of a Right to Sue Letter from the EEOC mailed on or about April 1, 2019.

17. Plaintiff also cross-filed a timely written charge of discrimination with the Philadelphia office of the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission alleging discrimination and retaliation on or about February 26, 2019 (No. 530-2019-02526).

18. The instant action is timely because it is initiated at least ninety ("90") days after the receipt of a Right to Sue Letter from the EEOC on the second charge mailed on or about April 1, 2019.

19. Plaintiff has exhausted federal administrative remedies as to the allegations of the instant Complaint.

20. Plaintiff will later amend this complaint to incorporate claims under the Pennsylvania Human Relations Act at any time after the statutory one year waiting period up to and including during trial consistent with Fed.R.Civ.P. 15 insofar as these claims are construed coextensively with their federal counterparts.

**FACTUAL BACKGROUND**

21. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

22. Prior to her unlawful termination on or about February 25, 2019, Plaintiff was an employee of Defendant who began working in or around October 2015.

23. Ms. Suzanne Dorfman, Outpatient Clinical Supervisor was assigned to Aldie Counseling Center in August 2018.

24. Dorman had worked at the Doylestown Aldie Facility for five years prior to her transfer to the Langhorne office.

4

25. She reported to Melinda Goodwin who is Clinical Director of both the Langhorne and Doylestown Facility.

26. Initially Dorfman stated she wished to support her outpatient treatment team and admitted that before, there was minimal clinical supervision.

27. Apparently, she wished to gain trust and informed her team she had minimal supervisory and/or outpatient treatment experience and was therefore, unqualified in this regard.

28. Plaintiff informed Dorman that her prior supervisor had been unprofessional with her personally and Plaintiff told her that, considering her inexperience and the fact that she wished to be trusted, all Plaintiff required in return was to be professionally respected.

29. Dorfman was obviously aware of the prior supervisors' lack of support given to the outpatient treatment program.

30. She was also aware that Plaintiff had reported to the funders that Parkway Lab's laptop (which contained over 300 clients' confidential medical information) had been stolen from the facility and that because management failed to report the theft until Plaintiff spoke up, almost 30 days after it was stolen.

31. It seemed, at least on the surface that Dorfman wanted to make positive changes going forward.

32. However, two months later or about October 23, 2018 Plaintiff's attendance was required for a "Meet and Greet" between Therapists and the Bucks County Department of Probation and Parole Department.

33. Plaintiff understood that the purpose of this "Meet and Greet" was to strengthen the professional relationships between the therapists and Probation Officers since they had mutual

5

clients in common who were receiving treatment services and were also active in the legal system.

34. There was no agenda or topic given to the therapists beforehand; therefore, it was a short luncheon.

35. The meeting started out with a Jerry (CEO) telling one of his lighthearted funny stories.

36. Management was sitting in front of the room surrounded by Aldie Therapists and Probation Officers.

37. Each person went around the room introducing themselves by stating their name, credentials and department.

38. Plaintiff had communicated either by email or telephone with many of the Probation Officers in attendance over the last three years but had not officially met them in person.

39. Plaintiff later discovered that this "Meet and Greet" was scheduled to address problematic issues that the Bucks County Probation Department had with the Langhorne agency therapists.

40. On or about October 25, 2018, Plaintiff met with Dorfman for her weekly individual supervision where they were supposed to process any of Plaintiff's clinical concerns and/or issues.

41. Instead Dorfman reprimanded Plaintiff over alleged "inappropriate behavior" during the "meet and greet" two days prior.

42. At first, Plaintiff thought she was kidding around, but she said she was serious.

43. Dorfman stated she did not know how to say what she was going to say without it possibly upsetting Plaintiff.

44. Dorfman stated at the "meet and greet" Plaintiff was too "happy" and that her "expressions were inappropriate."

45. Other male therapists engaged in similar "happy behavior."

46. Dorfman stated she did not hear the same.

47. Plaintiff then pointed out how Jerry, the Director, made a few funny comments as well.

48. Dorfman went on and added that Plaintiff had "no respect for the hierarchy" present during that meeting.

49. Plaintiff still could not understand why she was being reprimanded.

50. Plaintiff expressed her confusion and asked for more specifics.

51. Dorfman then stated, "You need to take your inappropriate personal relationships out to the parking lot and not bring your personal relationships into the group".

52. At this point, Plaintiff told her to stop but she continued to inform her that Plaintiff had "no boundaries", that she was "not part of team" and that she "should have never validated" an officer's frustrations during the meeting.

53. Plaintiff returned to her office and her co-worker Jenn on her office door to discuss a client, but Plaintiff broke down in tears and told her what Dorfman said.

54. Plaintiff asked Jenn if she had seen any inappropriate behaviors during "meet and greet" and she said adamantly "absolutely not".

55. It was obvious Plaintiff was being treated, and regarded, in a completely different way than the males at the table.

56. It was all right for the men to joke and keep things lighthearted but apparently, for Plaintiff, she had "inappropriate personal relationships" that she was bringing to the meeting.

57. Later on, Plaintiff confronted Dorfman about how she felt discriminated against based on her gender.

58. Plaintiff was treated in a different way from the males and singled out improperly and, Plaintiff told her illegally.

59. Further, the accusation of having inappropriate "personal relationships" (which Plaintiff took as meaning and/or implying intimate relationships and saying that she had to leave them in the parking facility) was an obvious accusation accusing Plaintiff of improper sexual conduct.

60. This was a discriminatory and harassing statement and impugned Plaintiff improperly and entirely without evidence or basis.

61. After Plaintiff complained based on gender and sexual harassment, she was retaliated against and singled out.

62. Plaintiff expressed to Dorfman numerous times, since the episode described above, that she has treated her differently and singled her out.

63. Plaintiff would go to Dorfman often to report various concerns over client care issues and would receive a brush off response.

64. On January 4, 2019, during an individual supervision, Dorfman informed Plaintiff that Defendant would be piloting an Intensive Outpatient Treatment Program (IOP) and the Outpatient Treatment Team of Therapists would be facilitating the groups.

65. It was a 4 day (9 plus hours) 12-16-week program.

66. Plaintiff was happy to be one of these group facilitators, but informed Ms. Dorfman that she lacked experience facilitating a (ASAM) American Society of Addiction Medicine, Intensive Outpatient Program (IOP), and would need some support and guidance.

67. Ms. Dorfman assured Plaintiff that "she had her back" and would provide the support and guidance needed to be an effective (IOP) group facilitator.

68. The Intensive Outpatient Program (IOP) was initially scheduled to begin January 14, 2019 but pushed back to begin on January 21, 2019.

69. Dorfman asked the Outpatient Treatment team of 4 therapists to continue working on a curriculum for the ASAM IOP.

70. Plaintiff was assigned to that Monday's Intensive Outpatient Therapy (IOP) group which focused on processing "Developing Recovery" with group participants.

71. For the next few weeks Plaintiff researched ASAM IOP independently because, contrary to the representation, there was little or no direction.

72. During group supervision on January 16, 2019, Plaintiff expressed her apprehension over starting a 12-16-week IOP with little to no direction and/or guidance from management.

73. There had been neither a clear policy nor a procedure program such as group member latenesses, breaks, billing etc.

74. Plaintiff specifically asked for additional assistance from Ms. Goodwin because she most likely had more experience developing these Clinical Programs.

75. On January 21, 2019, Plaintiff facilitated her first Intensive Outpatient group of up 4 participants.

76. There was no lateness policy nor direction on how to complete progress notes for group members who come to group late.

77. Furthermore, there was no direction and/or information entering likenesses and breaks on widgets (billing).

78. However, on January 28, 2019, Plaintiff facilitated her second Intensive Outpatient Group.

79. Plaintiff expressed concerns over clients falling asleep.

80. The next day, January 29, 2019, the front office informed Plaintiff that both Dorfman and Lee had an issue with her facilitation the previous day.

81. Plaintiff went to Dorfman and asked what the issue was, and she yelled at her saying Plaintiff gave a 20-minute break and let the group out 20 minutes early.

82. Dorfman informed Plaintiff that she and Ms. Lee watched Plaintiff over the video camera.

83. Dorfman accused Plaintiff of fraudulent billing despite knowing that she would never do anything knowingly fraudulent.

84. Basically, she was attempting to set Plaintiff up for failure, first, by failing to train her and second by failing to give her appropriate guidelines and then accusing her, entirely recklessly and improperly of a crime.

85. In short, it was simply more retaliation.

86. Plaintiff reminded Dorfman about earlier conversations they previously had over her legitimate concerns about running a group with her limited experience and minimal direction.

87. Dorfman directed Plaintiff to amend her widget to reflect 1.5-hour billing instead of 2-hour billing and she complied.

88. The Fiscal Department assisted Plaintiff with amending billing.

89. On February 4, 2019, Plaintiff facilitated a 2-hour group.

90. Due to still not having clear and concise information and/or training about the TOP) policies and procedures Plaintiff did not allow breaks, did not allow late group members in the room if they were 10 minutes late and did not let group member out early.

91. This same day Plaintiff was informed by her colleagues that Ms. Goodwin and Ms. Dorfman reprimanded Jennifer Sharpe, who works in the Fiscal department, insofar as she had interrupted a fraud investigation against Plaintiff.

92. Plaintiff was mortified, embarrassed, confused and devastated over the entire bogus accusation of fraud.

93. On February 5, 2019, Plaintiff attended a required Fraud and Waste meeting, but again there was no clear direction about billing.

94. The Fiscal Department and Management were not on the same page.

95. Therapists were being instructed to do one thing, but fiscal was requiring another.

96. Fiscal was following compliance rules and management was not leading to obvious inconsistency.

97. Ms. Dorfman was directing employees "NOT to put exact times on group notes as to when clients enter group. Only put exact times on widgets".

98. Plaintiff double checked with the Fiscal Department who said Dorfman was incorrect and not in compliance with the operative rules and system

99. According to the fiscal department, group notes must match widget (billing) notes.

100. On February 6, 2019, Plaintiff was very upset still over the fraud accusation and asked Dorfman not to retaliate against her and set her up for failure.

101. Plaintiff informed her that she would not do anything intentionally and asked her to please inform her if she was doing things incorrectly so she could correct it.

11

102. On February 11, 2019, Plaintiff was informed by the Front Office that Dorfman was pulling her charts to audit.

103. Auditing 2 charts per month was somewhat normal, but the Front Office, in a clear act of retaliation, was pulling up to 5 of Plaintiff's charts.

104. Meanwhile Plaintiff's co-worker, Ellis, gave her notice and indicated she would be leaving the agency within a month.

105. The normal procedure would have been to increase efforts to audit Ellis's charts while she was still employed at Defendant.

106. At that point, Defendant would be able to provide what is needed in the chart before Ellis left.

107. On February 12, 2019, Plaintiff once again expressed concerns to Dorfman about being targeted.

108. On February 15, 2019, 2 co-workers (Jackie and Jess) informed Plaintiff that they were both directed to meet with Ms. Goodwin first thing in the morning.

109. This was not a scheduled meeting (both co-workers met with Ms. Goodwin separately).

110. Ms. Goodwin informed both co-workers that she watched them over video go into Plaintiff's office and Ms. Goodwin informed both that Plaintiff was filing a grievance.

111. They were directed and given a warning not to have any communication with Plaintiff during work hours and if they disobeyed, they could be terminated from their employment.

112. This was an additional act of retaliation.

113. Moreover, Defendant failed to accommodate Plaintiff for her narcolepsy, which is a disability that was disclosed to it.

114. Plaintiff requested reasonable accommodations regarding her hours, but Defendant failed to enter a dialogue regarding the same and ultimately failed to accommodate Plaintiff in anyway.

115. On or about February 22, 2019, Plaintiff filed her first charge of discrimination against Defendant, which was forwarded to them via electronic mail.

116. On Monday, February 25, 2019, Plaintiff was terminated in a direct act of retaliation.

## COUNT I
## Americans with Disabilities Act ("ADA")

117. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

118. Plaintiff is a "qualified individual with a disability" as that term is defined in the ADA because Plaintiff has, or had at all times relevant hereto, a disability that substantially limited/limits one or more major life activities, or because Plaintiff had a record of such impairment.

119. Plaintiff also is a "qualified individual with a disability" as that term is defined in the ADA because Plaintiff was regarded as and/or perceived by Defendant and its agents as having a physical impairment that substantially limited/limits one or more major life activities.

120. The foregoing conduct by Defendant constitutes unlawful discrimination against Plaintiff on the basis of disability or perceived disability.

121. The foregoing conduct by Defendant constitutes unlawful retaliation against Plaintiff for engagement in protected activity.

122. Plaintiff was also subjected to an unlawful hostile work environment.

123. Defendant also patently failed to engage in the interactive process as required by law.

124. As a result of Defendant's unlawful discrimination and retaliation, Plaintiff has suffered damages as set forth herein.

## COUNT II
### Title VII Violations

125. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

126. The foregoing conduct by the Defendant constitutes unlawful gender discrimination.

127. The foregoing conduct by the Defendant constitutes a hostile work environment.

128. The foregoing conduct by the Defendant constitutes unlawful retaliation.

129. As a result of the Defendant's unlawful discrimination and retaliation, the Plaintiff has suffered damages as set forth herein.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enter judgment in Plaintiff's favor and against the Defendant and that it enter an Order as follows:

   a. The Defendant is to be permanently enjoined from engaging in discrimination against Plaintiff on any other basis prohibited under applicable law;

   b. The Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of permitting discrimination and retaliation in the workplace, and is to be ordered to promulgate an effective policy against such harassment and discrimination and to adhere thereto;

   c. The Defendant is to be prohibited from continuing to maintain its unlawful policy, practice, or custom of discriminating against employees and is to be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

d. The Defendant is to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for the Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date Plaintiff first suffered discrimination at the hands of the Defendant or its agents until the date of verdict;

e. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by the Defendant's actions to the extent they are available as a matter of law.

f. Plaintiff is to be awarded punitive damages only as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or other employers from engaging in such misconduct in the future;

g. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

h. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

i. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law;

j. Plaintiff is to be granted such additional injunctive or other relief as may be requested during the pendency of this action in an effort to ensure Defendant does

not engage – or ceases engaging - in illegal retaliation against Plaintiff or other witnesses to this action; and

k. The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein.

l. Plaintiff demands trial by jury on all issues so triable pursuant to Fed.R.Civ.P. 38(b)(1).

Respectfully submitted,

KOLMAN LAW P.C.

/s/ Timothy M. Kolman
Timothy M. Kolman, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
(T) 215-750-3134 / (F) 215-750-3138

*Attorneys for Plaintiff*

Dated: June 19, 2019